No. 12-15403

IN THE

# United States Court of Appeals
## for the Ninth Circuit

MARY FRUDDEN, ET AL.,

Plaintiffs-Appellants,

v.

KAYANN PILLING, ET AL.,

Defendants-Appellees.

On Appeal from the United States District Court for the District of Nevada
Civil Case No. 3:11-cv-00474-RCJ-VPC (Hon. Robert C. Jones)

**BRIEF FOR *AMICUS CURIAE***
**STUDENT PRESS LAW CENTER**
Filed in Support of Appellant, Seeking Reversal

Frank D. LoMonte (Ga. Id. No. 456505)
Adam Ezra Schulman (Pa. Id. No. 309749)
STUDENT PRESS LAW CENTER
1101 Wilson Boulevard, Suite 1100
Arlington, VA 22209-2211
(703) 807-1904

Louis M. Bubala III (Nv. Id. No. 8974)
ARMSTRONG TEASDALE LLP
50 West Liberty Street, Suite 950
Reno, NV 89501
(775) 322-7400
*Counsel of Record for Amicus*

June 12, 2012

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus*, the Student Press Law Center, is a IRS 501(c)(3) nonprofit corporation incorporated under the laws of the District of Columbia with offices in Arlington, Va. The Center does not issue stock and is neither owned by nor is the owner of any other corporate entity, in part or in whole. The corporation is operated by a 15-member volunteer Board of Directors.

## CERTIFICATE OF INTERESTED PERSONS

In addition to the interested persons named in the parties' respective Statements, *Amicus* discloses that the following entities have an interest in this matter:

(1)     The Student Press Law Center

(2)     Louis Bubala, Armtrong Teasdale LLP, Counsel to the Student Press Law Center

(3)     Frank D. LoMonte, Executive Director, Student Press Law Center

(4)     Adam Ezra Schulman, Legal Fellow, Student Press Law Center

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………….......iii

IDENTITY OF THE *AMICUS CURIAE*, STATEMENT OF INTEREST, AND
SOURCE OF AUTHORITY TO FILE………………………………………………vi

I. INTRODUCTION AND SUMMARY ................................................................ 1

II.     ARGUMENT ...................................................................................... 5

  A.     *Tinker* Must Be Applied Where a Student's Unmistakably Political
Expression Has Been Met With Disciplinary Action ........................................... 5

    1.   *Tinker* Provides the Appropriate Standard for Dress-Based Protest, Even
Where That Protest Violates Content-Neutral Dress Codes. ............................. 7

    2.   Content-Neutral Regulations, Untethered From the Interest in Preventing
Substantial Disruption, Will Not Suffice Justify the Punishment of Campus
Political Speech. ................................................................................. 16

  B.     *Morse* Cements *Tinker* as the Appropriate Level of Scrutiny for "Core"
Political Speech ................................................................................... 19

III. CONCLUSION ............................................................................... 22

# TABLE OF AUTHORITIES

Page

CASES:

*Anderson v. Hermosa Beach*, 621 F.3d 1051, 1068 (9th Cir. 2010) …………….13

*Baldwin v. Redwood City*, 540 F.2d 1360, 1368 (9th Cir. 1976)……………........13

*Bar-Navon v. Brevard County Sch. Bd.*, 290 Fed. App'x 273 (11th Cir. 2008)…14

*Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990)…………16

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 386 (6th Cir. 2005)……..…14

*Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988)…………………………….18, 19

*Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437 (5th Cir. 2001)………………14

*Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir. 1992)……………..16

*Cohen v. California*, 403 U.S. 15 (1971)……………………………………13, 19

*Corder v. Lewis Palmer High School*, 566 F.3d 1219 (10th Cir. 2009)………....2

*Corrales v. Bennett*, 567 F.3d 554 (9th Cir. 2009)…………………………..21-22

*DePinto v. Bayonne Bd. of Educ.*, 514 F. Supp.2d 633 (D.N.J. 2007)……....12, 15

*Ferrell v. Dallas Indep. Sch. Dist.*, 393 U.S. 856, 856 (1968)…………………..23

*Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918 (10th Cir. 2002)……..2

*Frudden v. Pilling,* ___ F.Supp.2d ___, No. 3:11-cv-00474, 2012 U.S. Dist. LEXIS 11171, at \*16-18 (D. Nev. Jan. 31, 2012)………………………………...3

*Galvin v. Hay*, 374 F.3d 739 (9th Cir. 2004)…………………………….……16

*Gillman v. Sch. Bd. for Holmes County*, 567 F. Supp.2d 1359 (N.D. Fla. 2008)………………………………………………………………………..…20

*Grayned v. Rockford*, 408 U.S. 104, 116-17 (1972)……………………..5, 9, 17-19

*Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 331 (2d Cir. 2006)…………..12

*Hatter v. Los Angeles City High Sch. Dist.*, 452 F.2d 673 (9th Cir. 1971)……………………………………………………………….9-11, 15-16

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)………………………2-3

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004)……….15

*Hoye v. Oakland*, 653 F.3d 835, 854 (9th Cir. 2011)…………………………6, 22

*Husain v. Springer*, 494 F.3d 108, 134 (2d Cir. 2007)……………………………9

*Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419 (9th Cir. 2008)……………*passim*

*Jones v. Bd. of Regents*, 436 F.2d 618 (9th Cir. 1970)………………………..17-19

*Karp v. Becken*, 477 F.2d 171 (9th Cir. 1973)………………………………...16

*Ladue v. Gilleo*, 512 U.S. 43, 57 (1994)………………………………….…7, 13

*Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001)……………14

*Long Beach Area Peace Network v. Long Beach*, 522 F.3d 1010 (9th Cir. 2008)……………………………………………………………………………..20

*Lowry v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 756 (8th Cir. 2007)…..8-10, 15

*M.A.L. v. Kinsland*, 543 F.3d 841 (6th Cir. 2008)-………..………………...……2

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)………………………………...19

*Monteiro v. Elizabeth*, 436 F.3d 397, 404-05 (3d Cir. 2006)……………………..9

*Morgan v. Swanson*, 659 F.3d 359, 386 (5th Cir. 2011) (*en banc*) ……………..21

*Morse v. Frederick*, 551 U.S. 393 (2007)……………………………………19-20

*Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 259-60 (4th Cir. 2003)…12

*Nurre v. Whitehead*, 580 F.3d 1087 (9th Cir. 2009) ……………………………..2

*One World One Family Now v. Honolulu*, 76 F.3d 1009 (9th Cir. 1996)……....13

*Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502 (5th Cir. 2009)……...…14

*PeTA v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002)…………………….…18

*Pinard v. Clatskanie Sch. Dist.*, 467 F.3d 755 (9th Cir. 2006)………………....16

*Raker v. Frederick County Pub. Schs.*, 470 F. Supp.2d 634 (W.D. Va. 2007)…18

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002)………18

*T.A. v. McSwain Union Elem. Sch.,* No. 1:08-cv-01986, 2010 U.S. Dist. LEXIS 71976 (E.D. Cal. July 16, 2010)……………………………………………....9

*Texas v. Johnson*, 491 U.S. 397 (1989)…………………………………..….15

*Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503 (1969)....*passim*

*United States v. Wunsch*, 84 F.3d 1110, 1114 n.7 (9th Cir. 1996)……………....14

*Virginia v. Black*, 538 U.S. 343, 359 (2003)………………..…………………20

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002)…………………………………………………………………………....21

*West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).…………1, 3, 15, 21

*Wooley v. Maynard*, 430 U.S. 705 (1977).…………………………………….…3

<u>OTHER AUTHORITIES</u>:

*Case Comment: Fifth Circuit Upholds Texas School District's Dress Code Under Intermediate Scrutiny*, 123 HARV. L. REV. 2088, 2085 (2010)…………………23

Michael Kent Curtis, *Be Careful What you Wish for: Gays, Dueling High School T-Shirts, and the Perils of Suppression*, 44 WAKE FOREST L. REV. 431, 475 (2009).…………...……………………………………………………...….18

Facebook.com Statement of Rights and Responsibilities, *available at* http://www.facebook.com/legal/terms…………………………………………..12

## IDENTITY OF THE *AMICUS CURIAE*, STATEMENT OF INTEREST, AND SOURCE OF AUTHORITY TO FILE

This *Amicus Curiae* Brief is respectfully submitted by the Student Press Law Center. The Student Press Law Center (the "SPLC") is a nonprofit, non-partisan organization founded in 1974 with the mission of promoting youth involvement in civic life through journalism. The SPLC provides free educational materials and workshops to students across the country about the First Amendment and about ways to protect their free-expression rights, and its attorneys are the authors of the widely used reference text, *Law of the Student Press*. The Center regularly appears in state and federal appellate courts, including this Court, to provide additional perspective and context as an advocate with many years of experience working directly with students who are prevented by their schools from speaking out on matters of public concern.

The SPLC and its members across the country have an interest in protecting the ability of students to address matters of public policy using all communication platforms without fear of disciplinary reprisal. The ruling of the District Court below would – were it to become binding precedent in this Circuit – risk exposing students to disciplinary sanctions for peaceful, non-disruptive expressions of dissent from school policies. This brief is being filed with a motion seeking leave of the Court for *Amicus* to appear.

# I. INTRODUCTION AND SUMMARY

Almost seventy years ago, the U.S. Supreme Court declared that public school students have a constitutional right to express disapproval of mandatory adherence to the Pledge of Allegiance by refusing to obey the directive.[1] Since then, numerous federal courts – including this one – have reaffirmed two bedrock First Amendment principals: (1) that students are "persons" and not walking billboards for the display of whatever message the government might choose, and (2) that the government may not shut down an entire method of expressing dissent in the guise of a "content neutral" rule, especially where the method is a uniquely effective and affordable one. The ruling below in this case is irreconcilable with these bedrock principles. When viewed in context alongside the panoply of restrictions on the ability of students to question school policies, the ruling makes it almost impossible to effectively communicate a dissenting viewpoint in opposition to a dress code.

The canvas upon which students in America's public schools may safely express their views has been shrunken in recent years almost to the point of nonexistence. Although the broad First Amendment protection of *Tinker v. Des*

---

[1] *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

*Moines Independent Community School District*[2] remains in full force, the real-estate on which a student may speak safely within *Tinker*'s protection has greatly eroded. Through application of *Hazelwood School District v. Kuhlmeier*[3] and the "forum analysis" that it ushered into the schools, young people have lost the right of free expression in student newspapers,[4] in hallways,[5] during graduations speeches,[6] in musical performances,[7] and in virtually every other square inch of the school building.

Virtually the last remaining vehicle where a student today may confidently express his views during the school day without fear of reprisal is the "forum" the

---

[2] 393 U.S. 503 (1969).

[3] 484 U.S. 260 (1988).

[4] *Id.* (holding that removal of stories concerning teen pregnancy and divorce from high school student newspaper did not violate students' First Amendment rights).

[5] *M.A.L. v. Kinsland*, 543 F.3d 841 (6th Cir. 2008) (no First Amendment violation in preventing middle-school student from distributing leaflets in hallways between classes, because hallways are a nonpublic forum); *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918 (10th Cir. 2002) (school had authority to censor religious messages on commemorative wall tiles installed at Columbine High School).

[6] *Corder v. Lewis Palmer High School*, 566 F.3d 1219 (10th Cir. 2009) (no First Amendment violation in refusing to allow valedictorian to deliver her chosen speech, then compelling her to issue a school-dictated apology when she deviated from school-approved text).

[7] *Nurre v. Whitehead*, 580 F.3d 1087 (9th Cir. 2009) (no First Amendment violation in school overriding students' choice of musical accompaniments for commencement ceremony).

student wears on his own body. Speech on clothing – unlike speech in a newspaper, on a bulletin board, in a hallway, or at a graduation ceremony – unmistakably is the personal speech of the individual wearer and not that of the school. In this case, the School District seeks to deprive students of those final few uncensored inches. If the ruling below is allowed to stand, then the area within the school where *Tinker* applies will be essentially an empty set.

*Amicus* fully agrees with Appellant that the Policy is facially infirm because it compels particularized speech. To follow the District Court's compelled-speech standard – whether a "bystander" or "observer" would believe the speech was the students' own speech[8] – would require overruling the Supreme Court's seminal compelled-speech decision in *Barnette* (forcing entire class to recite Pledge of Allegiance in unison is unconstitutionally compelled speech) and a host of subsequent cases. *E.g., Wooley v. Maynard*, 430 U.S. 705 (1977) (requiring all licensed New Hampshire motorists to display common license plate motto is unconstitutionally compelled speech).

Indeed, the District Court's view represents a bizarre and dangerous inversion of the *Tinker-Hazelwood* student speech framework. In *Hazelwood*, the Supreme Court recognized an exception to the default standard of *Tinker* where –

---

[8] *Frudden v. Pilling,* ___ F.Supp.2d ___, No. 3:11-cv-00474, 2012 U.S. Dist. LEXIS 11171, at *16-18 (D. Nev. Jan. 31, 2012) (ER 13-14).

as in the case of a class-produced "curricular" newspaper – an audience member might mistake the student speaker's message for the official message of the school. The court below turned this completely upside-down. It is one thing to say that a student has limited rights to use school property to convey a message. It is quite another to say that a *school* has unlimited rights to use *student* property to convey a message.

Because school administrators whose policies are the subject of student criticism occupy the role of victim, accuser, prosecutor, judge and jury, it is especially important that the courts afford broad First Amendment protection to speech challenging school orthodoxy. It is a human impulse to recoil from criticism, and courts should be especially solicitous of the First Amendment rights of students when the discipline involves dissent from a school policy in which – as here – the disciplinarian is personally invested.

Four years ago, this Court decided *Jacobs v. Clark County School District*, 526 F.3d 419 (9th Cir. 2008), marking a drastic departure from previous Circuit and Supreme Court jurisprudence. *See id.* at 443 (Thomas, J., dissenting); *see also infra* § II.A.2. *Jacobs* upheld the facial constitutionality of a uniform policy that served broad prophylactic aims. *Jacobs*, 526 F.3d at 435. It held that *Tinker* has no application to content-neutral regulations, *id.* at 430-32 – although the Supreme Court had unmistakably said otherwise in evaluating an anti-noise ordinance in

*Grayned v. Rockford*, 408 U.S. 104, 116-17 (1972). It even held "that choice of clothing is not *completely* curtailed, as students are still permitted to choose what clothing to wear after school, on weekends, and at non-school functions." *Jacobs*, 526 F.3d at 437 – without mention of the fact that a school has no jurisdiction to curtail such choices. At a minimum, this Court should now fashion an available limiting principle to mend the doctrinal fissure that has been created by *Jacobs*. *See infra* § II.A.1, II.B. As shown below, such a limiting principle is readily discernable on these facts, where a student – unlike those in *Jacobs* – is engaged in protesting <u>the dress code itself</u> at a time when the dress code is a matter of contested political debate.

## II. ARGUMENT

### A. *Tinker* Must Be Applied Where a Student's Unmistakably Political Expression Has Been Met With Disciplinary Action

Presuming *arguendo* that the Roy Gomm School mandatory uniform policy (the "Policy") is a facially constitutional content-neutral rule,[9] as-applied punishment of political expression under the rule must still satisfy the *Tinker*

---

[9] *Amicus* fully agrees with Appellant that the policy is facially infirm under the First Amendment because the discretionary exemptions written into the policy make it content and/or viewpoint-based.

standard.[10] This Court has previously distinguished between two-types of as-applied challenges: the first where the law cannot constitutionally be applied to the facts of cases like those of the plaintiff; and the second where the application of an otherwise constitutional law is selective and discriminatory. *Hoye v. Oakland*, 653 F.3d 835, 854 (9th Cir. 2011).

Both types of challenge are potentially viable in this case. The former type of as-applied challenge is present because the school uniform policy cannot be constitutionally applied to punish those who engage in non-disruptive political protest speech. The latter type is present because the Fruddens and their children have alleged facts from which one can reasonably infer discriminatory treatment on the basis of their political viewpoint.[11]

A ruling in favor of the Fruddens does not compel the conclusion that all school uniform policies are constitutionally infirm; far from it. Where a school enacts a uniform policy to, for example, respond to imminent gang violence

---

[10] Under this standard, student speech is constitutionally protected unless school officials can reasonably "forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514.

[11] If the Court upholds the former challenge, it should remand for entry of a ruling in Frudden's favor as a matter of law, because it is undisputed that the speech at issue resulted in no disruption nor likelihood thereof. If it upholds only the latter, it should remand to the District Court for fact-finding on the question of the motivation for the school's punishment: whether it was viewpoint discriminatory enforcement or born of even-handed compliance with the rules.

occasioned by the wearing of gang emblems or colors, and a student flouts the policy, *Tinker*'s "disruption" standard is satisfied and the discipline is constitutionally permissible.

While *Jacobs* foreclosed many paths to a facial invalidation of a content-neutral uniform policy, it explicitly left an avenue for challenge available where (as here) the policy entirely forecloses the use of a medium for expressive purposes. *Jacobs*, 526 F.3d at 426 n.18; *see also infra* at 13-15 (citing *Ladue v. Gilleo*, 512 U.S. 43 (1994)).[12]

> **1.** **_Tinker_ Provides the Appropriate Standard for Dress-Based Protest, Even Where That Protest Violates Content-Neutral Dress Codes**

Protests through dress are "closely akin to pure speech" and thus are "entitled to comprehensive protection under the First Amendment." *Tinker*, 393 U.S. at 505-06. "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be

---

[12] The essence of a content-neutral time, place and manner regulation is that it enables government to restrict expressive conduct where the method of expression would disrupt good order (*e.g.*, an electric bullhorn in the public library). But as the *Jacobs* court implicitly recognized, a regulation cannot entirely ban a means of expression under the guise of a "time, place and manner" regulation even where nothing about the time, place or manner of the speech at issue is disruptive. (For instance, Frudden could not wear a nonconforming shirt even on a day when the school was full of Boy Scouts and Girl Scouts wearing nonconforming shirts, or wear it on the playground at recess when students are engaging in boisterous behavior that would be undisturbed by a question about a shirt.)

confined to the expression of those sentiments that are officially approved." *Id.* at 511. *Tinker* involved several students who decided to publicize their opposition to the Vietnam War through the wearing of black armbands. Immediately inside the schoolhouse gate, they were met with disapprobation, were sent home and suspended. The Supreme Court held this unconstitutional as the punishment was based upon "undifferentiated fear or apprehension of disturbance," not a reasonable forecast of "substantial disruption" or "material interference with school activities." *Id.* at 508, 514.

Applying *Tinker*, both this Circuit and the Eighth Circuit have held that dissenting from a content-neutral dress code/uniform policy via the wearing of non-conforming protest clothing is constitutionally protected speech. When Watson Chapel School District implemented a mandatory uniform policy, several students and parents were outraged. In defiance, students handed out and wore black armbands as a symbolic protest—in violation of a provision of the policy forbidding "any attempt to defeat the uniformity intended by this policy."[13] *Lowry v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 756 (8th Cir. 2007). After incurring discipline, the students alleged that the school had violated their First Amendment

---

[13] *Compare* Roy Gomm Policy § III, Complaint ¶ 89 (ER 45) ("The uniform may not be altered in any way."). Lowry also violated a second content-neutral student literature review policy by distributing a petition without prior approval of the principal. *Lowry*, 540 F.3d at 756.

rights. Because the school could not satisfy the *Tinker* standard, the Eighth Circuit affirmed summary judgment in favor of the students. *Id.* at 760-61.[14]

Most significantly, the Eighth Circuit reached its outcome notwithstanding the preexisting, facially constitutional, content-neutral apparel policy. *Id.* at 760. "[T]he board's intent in creating and its timing of enforcement of the student uniform policy are irrelevant." *Id.*; *accord Grayned*, 408 U.S. at 119 (the decision to punish under a content-neutral statute should be made by seeing whether *Tinker* applies on "an individualized basis, given the particular fact situation"). That "the protest object was merely a school dress code [rather than federal military policy as in *Tinker*]… is immaterial" to the question of whether it is protected speech. *Lowry*, 540 F.3d at 759-60. *Accord Hatter v. Los Angeles City High Sch. Dist.*, 452

---

[14] Unlike in this case, Lowry at the beginning of trial obtained a stipulation from the defendants that the punishment had been imposed on the basis of the content of the message expressed by the armbands and that the armbands had caused no substantial disruption. *Id.* at 757. Frudden was improperly denied this opportunity to corroborate her complaint's averments because of the grant of the motion to dismiss before discovery and fact-finding could occur. An official's purported reliance on existing-content neutral rules is a jury question; it should not be determined at summary judgment when contested and certainly not before discovery. *See, e.g., Husain v. Springer*, 494 F.3d 108, 134 (2d Cir. 2007); *T.A. v. McSwain Union Elem. Sch.,* No. 1:08-cv-01986, 2010 U.S. Dist. LEXIS 71976, at *16-19 (E.D. Cal. July 16, 2010) (denying summary judgment in school dress case when there existed factual disputes as to whether school's abridgement of speech was motivated by a dislike of the student's viewpoint); *Monteiro v. Elizabeth*, 436 F.3d 397, 404-05 (3d Cir. 2006) (the intent of an official must be determined by the jury or other factfinder before the question of law can be determined by the court).

F.2d 673, 674-75 (9th Cir. 1971). All that mattered was that "a school district punished students based on their non-disruptive protest of a government policy." *Lowry*, 540 F.3d at 760.

Presaging *Lowry* by thirty-five years, *Hatter* also involved a school's imposition of a dress code. In a responsive act of civil disobedience, a student wore a tag on her dress emblazoned with a "militant slogan" urging fellow students to boycott the school's chocolate drive. She incurred disciplinary action. *Hatter*, 452 F.2d at 674. This Circuit reversed the district court's denial of her First Amendment claim, stating:

> At issue is the right of students peacefully to protest policies of their school that serve to restrain their freedom of action. That these policies may not directly affect the adult community or concern the nation as a whole is of no moment. … Students in school as well as out of school are 'persons' under our Constitution. They are entitled in the absence of compelling countervailing considerations to exercise their First Amendment right to freely express themselves upon those issues which concern them. It is not for this or any other court to distinguish between issues and to select for constitutional protection only those which it feels are of sufficient social importance.

*Id.* at 675 (quoting *Tinker*).

It is thus possible – and indeed necessary, as the Circuit has not overruled *Hatter* – to reconcile these lines of cases into a *Jacobs* line (in which students use clothing to express their views on unrelated issues) and a *Hatter/Lowry* line (where students use clothing to express dissent from the dress code itself).

10

It is <u>essential</u> to recognize this doctrinal exception from *Jacobs*, because to do otherwise would countenance impermissible viewpoint discrimination. When a student who objects to the dress code gets prepared for school each morning, he faces a binary choice. He may wear conforming clothing and implicitly recognize the validity of the dress code, or he may wear nonconforming clothing and express his belief in the code's invalidity. If he wears the noncompliant clothing, he faces punishment; if he wears the compliant clothing, he does not. Since the school has conceded (by recognizing exceptions to the code) that there is no educational imperative that every student always dress alike, it is *specifically because* the noncompliance carries a message of dissent from the dress code that the school punishes it. Wearing noncompliant clothing can be seen as conveying only one viewpoint – certainly, no one refuses to wear a school uniform to express *approval* of uniforms. This is why a *Jacobs*-type rule ("do not wear <u>any</u> messages on clothing") might be able to pass muster as non-viewpoint-discriminatory, but a Roy Gomm Elementary School policy must be viewed with the skepticism that applies when a government regulation discriminates based on viewpoint. Failing to apply that searching level of scrutiny here was error.

Wearing oppositional clothing is a generally valuable mode of political demonstration,[15] but it is a uniquely indispensable mode of political expression when what is being protested is the very dress code being defied. *See also DePinto v. Bayonne Bd. of Educ.*, 514 F. Supp.2d 633 (D.N.J. 2007) (applying *Tinker* to the disciplining of two elementary school students who protested a mandatory uniform policy by wearing buttons featuring a photograph of members of the Hitler Youth and bearing the phrase "No School Uniforms").

It is doubly important that a student have the ability to use clothing as a means of expression because so few alternative channels of communication are available. An elementary school student will not be invited to deliver a guest commentary on the evening newscast and will not have the money to purchase a newspaper ad or a billboard. An elementary school student will not be able to go home and start a social-networking page on Facebook so as to generate opposition.[16] There is no other venue in which elementary school classmates

---

[15] *See Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 331 (2d Cir. 2006) (applying *Tinker* to student's as-applied challenge to the school dress code, where school imposed discipline for wearing a political t-shirt); *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 259-60 (4th Cir. 2003) (concluding there was a strong likelihood of success on student's First Amendment overbreadth challenge to a dress code that prohibited promotion of political messages through clothing).

[16]*See* Facebook.com Statement of Rights and Responsibilities, Sec. 4, Para. 5 ("You will not use Facebook if you are under 13."), *available at* http://www.facebook.com/legal/terms (last viewed June 11, 2012).

congregate so as to make that target audience accessible. If an elementary school student loses the ability to use the shirt on his back to non-disruptively express disagreement with school policies, then he has no reasonably effective alternative.

This Court can no more require a dress-code dissenter to obey the dress code and to protest through some other means than could the Court require a Pledge-of-Allegiance dissenter to continue standing and reciting the Pledge and protest through some other means. Protesting through other means does not express the same message. *See Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) (discussing the uniqueness of expression via one's chosen medium); *One World One Family Now v. Honolulu*, 76 F.3d 1009, 1015 (9th Cir. 1996) ("[W]earing a message-bearing T-shirt might be a uniquely valuable mode of communication whose total ban could raise serious constitutional questions(.)") (citing *Cohen v. California*, 403 U.S. 15 (1971)); *Anderson v. Hermosa Beach*, 621 F.3d 1051, 1068 (9th Cir. 2010) (invalidating a blanket ban on another distinctive mode of expression: tattooing); *Baldwin v. Redwood City*, 540 F.2d 1360, 1368 (9th Cir. 1976) (recognizing the importance of inexpensive, effective and localized methods of political communication). *Jacobs* explicitly left undecided the question of whether the Constitution permitted the wholesale banishment of communicative clothing from the domain of the First Amendment. *Jacobs*, 526 F.3d at 426 n.18. Although it is not clear that Appellants made this argument below, this Court retains the

discretion to decide any pure question of law where the facts are not in dispute. *United States v. Wunsch*, 84 F.3d 1110, 1114 n.7 (9th Cir. 1996), and the Court should do so here.

Though there are several cases upholding dress code/uniform policies as valid content-neutral regulations, none of these cases involved an as-applied challenge to a political protest of the uniform. In fact, many of the cases specifically noted the absence of any particularized expressive or political statement. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 386 (6th Cir. 2005) (petitioner acknowledged that there was "no particular message" she wished to convey through her clothing); *Bar-Navon v. Brevard County Sch. Bd.*, 290 Fed. App'x 273, 275 (11th Cir. 2008) ("non-compliant piercings were intended to make no religious or political statement"); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437 (5th Cir. 2001) (facial challenge); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001) (same).

Although *Jacobs* and *Palmer v. Waxahachie Independent School District*, 579 F.3d 502 (5th Cir. 2009) involved religious and political expression respectively, the crucial distinction is that neither case involved a political challenge to the very uniform policy that was contravened, nor even a school policy at all. Two major implications follow from this distinction. First, when the political or religious speech has nothing inherently to do with the uniform policy, it

14

is far more reasonable to conclude that ample alternative channels are available for the expression of that message. But when the protest is about the rule itself, the medium becomes uniquely valuable. *See Hatter*, *Lowry*, *DePinto*, *supra*; *see also Texas v. Johnson*, 491 U.S. 397, 417 n.11 (1989) ("[M]essages conveyed without use of the flag are not 'just as forcefu[l]' as those conveyed with it…"). This explains why the Supreme Court in *Barnette* held that primary and secondary school students had a right to violate the generally-applicable requirement to salute the flag, not merely that they had the right to protest the salute by other extracurricular avenues that were available. *Barnette*, 319 U.S. at 632-34, 642. *Cf. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004) ("School officials may not punish indirectly, through the guise of insubordination, what they may not punish directly."). When the message relates to the subject matter of the medium, no other equally adequate or effective channels exist to convey the message.

Second, where the protest relates to a school policy, it raises the immediate inference that the punishment was "based, at least in part, on the particular messages students were attempting to communicate," a context in which *Tinker* is unquestionably the appropriate standard. *Jacobs*, 526 F.3d at 431. As this Circuit has long recognized, on-campus political protest of a school's administrative policies is *Tinker*-protected speech. Regardless of alternative means available

outside the schoolhouse gate, only when expressed on school grounds can it precisely target the desired audience. *See, e.g., Pinard v. Clatskanie Sch. Dist.*, 467 F.3d 755, 769 (9th Cir. 2006) (applying *Tinker* to politically motivated expressive boycott of team coach); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 530 (9th Cir. 1992) (applying *Tinker* to the suppression of expression on a "local political issue"); *Karp v. Becken*, 477 F.2d 171 (9th Cir. 1973) (applying *Tinker* to student's suspension for demonstrating against school's refusal to renew an English teacher's contract); *Hatter, supra. See generally Galvin v. Hay*, 374 F.3d 739, 750-52 (9th Cir. 2004) (explaining the intimate connection that can exist between the content of the message and the location in which it is expressed); *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) ("An alternative is not ample if the speaker is not permitted to reach the intended audience.") (internal quotation omitted). *Chandler* proclaims the general rule and its rationale: "[W]here arguably political speech is directed against the very individuals who seek to suppress that speech, school officials do not have limitless discretion." 978 F.2d at 531.

> **2.     Content-Neutral Regulations, Untethered From the Interest in Preventing Substantial Disruption, Will Not Suffice to Justify the Punishment of Campus Political Speech**

In *Grayned v. Rockford*, the Supreme Court grappled with how to analyze the constitutionality of a content-neutral rule that burdened campus political speech. 408 U.S. 104 (1972). The Court announced that "[t]he nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable. … Our touchstone is *Tinker*… in which we considered the question of how to accommodate First Amendment rights with the special characteristics of the school environment." *Id.* at 116-17.

Upholding the ordinance at issue, the Court reasoned that the "antinoise ordinance goes no further than *Tinker* says a municipality may go to prevent interference with its schools." *Id.* at 119. The Court continued, contrasting Rockford's antinoise ordinance, which is "narrowly tailored" to the "compelling interest in having an undisrupted school session," with "an impermissibly broad prophylactic ordinance." *Id.* As an example of an "impermissibly broad prophylactic ordinance," the Court cited approvingly to the decision in *Jones v. Board of Regents*, 436 F.2d 618 (9th Cir. 1970), where this Circuit invalidated a school regulation prohibiting the distribution of all handbills in campus areas other than in rooms designated for events. *Id.* at 620. Although the Court noted the possibility of imposing reasonable, time, place, and manner restrictions, it held the regulation was "neither designed, by its terms, only to prevent the disruption of the ordinary educational activities of the campus nor to insure that those seeking to

17

occupy the public campus for communicating ideas will not interfere with those seeking to occupy the public grounds for other legitimate purposes." *Id.* at 620. Applying the principles of *Tinker*, the Court then enjoined the regulation as an unconstitutional restriction on the petitioner's political non-violent speech. *Id.* at 621-22.

If the regulation in *Jones* was akin to a parent prophylactically requiring a child to wear a helmet, a uniform policy is no less than forbidding the child from getting on the bike at all. *Grayned*'s requirement that schools' content-neutral regulations hew to an interest in preventing disruption has continuing vitality. *See, e.g., Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988) (applying *Tinker* to declare unconstitutional a general prepublication review policy, which required prior approval for distribution of 10 or more copies of written material, as applied to students distributing a newspaper critical of school policies); *PeTA v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir. 2002) (following *Grayned* and determining whether there was a *Tinker* disruption when evaluating a content-neutral ordinance); *Raker v. Frederick County Pub. Schs.*, 470 F. Supp.2d 634 (W.D. Va. 2007) (enjoining a content-neutral policy as to political expression where there was no support for a finding of disruption).[17] *See also Sammartano v. First Judicial*

---

[17] *See generally* Michael Kent Curtis, *Be Careful What you Wish for: Gays, Dueling High School T-Shirts, and the Perils of Suppression*, 44 WAKE FOREST L.

(continued...)

18

*Dist. Court*, 303 F.3d 959, 969 (9th Cir. 2002) (absent a showing of a disruption or likelihood thereof, it is a First Amendment violation to prohibit wearing biker-related clothing in a public courthouse) (citing *Cohen* and *Tinker*). *But see Jacobs*, 526 F.3d at 435-36 (endorsing a school's pursuit of interests beyond preventing disruption).

*Jacobs*, however, neither cited nor addressed *Grayned*, nor *Jones*, nor *Burch*, all binding precedent. *Grayned* was correct that *Tinker* subsumes time, place and manner restrictions – see *Tinker*, 393 U.S. at 513 – and it is axiomatic that this Circuit may not overrule the Supreme Court. Nor could *Jacobs* have properly overruled *Jones* or *Burch* unless there was "clearly irreconcilable" intervening Supreme Court authority. *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (*en banc*).

### B. *Morse* Cements *Tinker* as the Appropriate Level of Scrutiny for "Core" Political Speech

Far from issuing "clearly irreconcilable" precedent contradicting the long lineage of case law consistently applying *Tinker* to the punishment of political

_____

(continued...)

REV. 431, 475 (2009) ("[I]t is a serious mistake to assume that because content and viewpoint discrimination are quite troubling, viewpoint and content neutral rules that suppress even more speech are always less troubling. The idea that broader suppression of all sorts of speech should consistently receive such relaxed scrutiny is a bizarre and curious way to read the language of the First Amendment.").

expression, the Supreme Court in its latest foray into the realm of student First Amendment law emphasized and reconfirmed the primacy of students' rights to engage in non-disruptive political activity when speaking at school.

In *Morse v. Frederick*, 551 U.S. 393 (2007), Chief Justice Roberts wrote that "[the facts] of *Tinker* are quite stark, implicating concerns at the heart of the First Amendment. The students sought to engage in political speech…Political speech, of course, is at the core of what the First Amendment is designed to protect." *Id.* at 403 (quoting *Virginia v. Black*, 538 U.S. 343 (2003)); *see also id*. at 402-03, 406 n.2. The controlling concurrence agreed: "[This majority's opinion] provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422 (Alito, J., joined by Kennedy, J., concurring). *Accord Long Beach Area Peace Network v. Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008) ("We have recognized that certain types of speech enjoy special status. Political speech is core First Amendment speech, critical to the function of our democratic system…[P]rotest…speech…rest[s] on the highest rung of the hierarchy of First Amendment values.") (internal citations omitted); *Gillman v. Sch. Bd. for Holmes County*, 567 F. Supp.2d 1359, 1375 (N.D. Fla. 2008) ("The robust exchange of political ideas is essential in a vibrant,

progressive society and is precisely the type of speech that is sacrosanct under the First Amendment.").[18]

A fair reading of the complaint supports the claim that both Mary Frudden and her children intentionally engaged in a course of unmistakable, political expression.[19] Complaint ¶¶ 58-60, 68, 75-76, 79, 91, 95-98, 106, 126, 154-55 (ER 38, 40, 41, 48-50, 51, 54, 59-60).[20] It supports the claim that school officials were antagonized by the political expression (*see* Complaint ¶¶ 64, 101 (ER 39, 50)), and that the students were even disciplined in a manner contrary to the Policy (*Compare* Complaint ¶¶ 108-09, 114-15 (ER 51, 52) *with* Policy § V (ER 46); ¶¶ 110, 121 (ER 51, 53) *with* Policy § VI.A (ER 46-47); ¶ 123 (ER 54) *with* Policy § V (ER 46)). *Contrast with Corrales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009)

---

[18] Even where conducting an intermediate scrutiny analysis for content-neutral regulation, a court should pay special attention to the burdens on political and religious speech when asking whether the regulation is overbroad. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165-68 (2002).

[19] Although they are elementary school students, the Frudden children still retain *Tinker* rights. *Morgan v. Swanson*, 659 F.3d 359, 386 (5th Cir. 2011) (*en banc*) ("[T]he student-speech rights announced in *Tinker* inhere in the elementary-school context."); *id.* at 404 (Elrod, J., writing for the majority in this part) (noting that in *Barnette* the students were in elementary school age, and in *Tinker*, two of the defying students were eight-year-old Paul Tinker, and his sister, eleven-year-old Hope Tinker).

[20] Frudden is also able to introduce photographic evidence in the district court that her son wore a piece of tape down the side of his shorts emblazoned with the phrase "no uniforms" on a day that he was disciplined.

("Plaintiffs here have only produced evidence that Bennett may have known that the students skipped school to participate in the protest, but not that he was opposed to that protest."). The complaint also supports the claim that the failure to abide by the uniform policy led to no disruption. Complaint ¶¶ 106, 152-53 (ER 51, 59). So that "the First Amendment's guarantees [do not] risk becoming an empty formality," courts should at minimum look behind the veil of content-neutral[21] policies. *Hoye*, 653 F.3d 835, 854 (9th Cir. 2011).

## III. CONCLUSION

*Tinker's* bedrock dictate that "state-operated schools may not be enclaves of totalitarianism" is familiar to many. *Tinker*, 393 U.S. at 511. Perhaps because it lacks the force of binding law, Justice Douglas's eloquent dissent from a denial of certiorari the year before is less familiar:

> It comes as a surprise that in a country where the States are restrained by an Equal Protection Clause, a person can be denied education in a public school because of the length of his hair. I suppose that a nation bent on turning out robots might insist that every male have a crew cut and every female wear pigtails. But the ideas of 'life, liberty, and the pursuit of happiness,' expressed in the Declaration of Independence, later found specific definition in the Constitution itself, including of course freedom of expression and a wide zone of privacy. I had supposed those guarantees permitted idiosyncrasies to flourish, especially when

---

[21] Again, *Amicus* assumes *arguendo* that this policy is content-neutral rather than content or viewpoint-based.

22

they concern the image of one's personality and his philosophy
toward government and his fellow men.

*Ferrell v. Dallas Indep. Sch. Dist.*, 393 U.S. 856, 856 (1968) (Douglas, J.,

dissenting from denial of cert.).

This Court retains the jurisdictional power to reaffirm the principle that our

educational system is not invested in the creation of a nation of robots. As

demonstrated above and in Appellants' brief-in-chief, such a ruling fits soundly

within the precedent of this Circuit and that of other federal courts around the

country. Although *Amicus* fully expects the Appellees to assert that endorsing the

Roy Gomm policy is a mere step beyond what this Court did in *Jacobs*, it is a

stride too far. Allowing a school to compel particularized speech, to grant school

officials unbridled discretion over case-by-case exceptions to the policy, and to

discipline pure political speech without a reasonable forecast of substantial

disruption edges ever farther down the slippery slope, toward an ultimately

unpalatable abridgement of individual rights.

Lest *Tinker* jurisprudence and students' First Amendment rights be

unnecessarily eroded,[22] *Amicus* respectfully requests that this Court reverse the

---

[22] *Accord Jacobs*, 526 F.3d at 442-45 (Thomas, J., dissenting); *Case Comment: Fifth Circuit Upholds Texas School District's Dress Code Under Intermediate Scrutiny*, 123 HARV. L. REV. 2088, 2085 (2010) (warning that applying the *Canady* exception to political speech effectively "swallow[s] the *Tinker* rule").

lower court and remand for discovery and trial. On the face of the allegations and amended complaint, Frudden and her children engaged in unmistakably political speech of which school officials were acutely aware and displeased. Notwithstanding the background existence of a generally applicable and purportedly content-neutral policy, *Tinker* disallows individual punishment on the basis of political speech if the school is unable to forecast a probability of a substantial disruption.

Respectfully submitted,

_____/s/Louis M. Bubala III___
Louis M. Bubala III (Nv. Id. No. 8974)
ARMSTRONG TEASDALE LLP
50 West Liberty Street, Suite 950
Reno, NV 89501
(775) 322-7400
*Counsel of record for Amicus*

Frank D. LoMonte (Ga. Id. No. 456505)
Adam Ezra Schulman (Pa. Bar No. 309749)
STUDENT PRESS LAW CENTER
1101 Wilson Boulevard, Suite 1100
Arlington, VA 22209-2211
(703) 807-1904

June 12, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2012, I electronically filed the foregoing (as an attachment to the motion for leave) with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

The foregoing also was mailed on the same date to:

Debra O. Waggoner, Esq.
Maupin Cox & LeGoy, P.C.
P.O. Box 30000
Reno, NV 89520
*Counsel for Appellees*

Eugene Volokh, Esq.
UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
*Counsel for Appellants*


      /s/Barbara Salinas
Barbara Salinas, an employee of
Armstrong Teasdale LLP

25

## CERTIFICATION OF COMPLIANCE

<u>Word Count</u>:  Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the foregoing brief was produced using a 14-point Times New Roman font and contains 4,620 words, excluding the parts of the brief exempted under Fed. R. App. P. 32(a)(7)(B)(iii).


      /s/Louis M. Bubala III
Louis M. Bubala, III